IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANDARD INSURANCE COMPANY,**<br><br>*Plaintiff*,<br>v.<br><br>**RALEIGH L. BURCH, JR.,**<br><br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CA No.:  1:06-CV-1755<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF STANDARD INSURANCE COMPANY'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR ORDER TO SHOW CAUSE WHY <u>PRELIMINARY INJUNCTION SHOULD NOT ISSUE</u>**

In accordance with Federal Rule of Civil Procedure 65(b) and Local Rule 65.1,, Standard Insurance Company ("Standard") submits this Supplemental Memorandum of Law in support of its Motion for a Temporary Restraining Order ("TRO") and requiring Defendant Raleigh L. Burch, Jr. to appear and show cause why a Preliminary Injunction should not issue on the claims alleged in Standard's Verified Complaint.  Since filing Standard's Complaint and Motion for a Temporary Restraining Order on October 16, 2006, Standard has learned that Defendant has written almost $155,000 in checks from his Standard Secured Access Account, with only a little over $17,000 remaining.[1]  *See* Affidavit of Holly Carstens, dated October 26, 2006, attached

---

[1]  As set forth in Standard's Verified Complaint and Memorandum of Law, Defendant has refused to turn over funds totaling $172,033.99 that Standard paid to Defendant by placing them in an interest-bearing Standard Secure Access account established in Defendant's name ("SSA account"). The funds are a portion of the death benefit under the life insurance policy that insured the life of Defendant's wife, Priscilla Davila ("Decedent"), who died of an illness on April 10, 2006.

hereto as Exhibit A.  Instead of responding to the notice provided by Standard, the voicemails left by Standard's counsel or the Motion filed by Standard, Defendant is attempting to ensure that the Benefit he wrongly received is never recovered.  Indeed, the day after Defendant received notice from Standard, he wrote two checks to himself totaling $100,000 in what can only be an attempt to prevent Standard from recovering the Benefit Defendant wrongfully received.

Therefore, Standard seeks an immediate TRO, and then a preliminary injunction, enjoining Defendant from spending the assets in his possession or control that comprise what is left of the life insurance proceeds received (the "Benefit"), until such time that this Court can decide the equitable claims raised in Standard's Complaint.  Defendant's failure to turn over the funds threatens Standard with irreparable harm because of the impending use of those funds.  Also, without enjoining Defendant from spending the Benefit, any determination that Defendant is not entitled to retain the Benefit would be unenforceable.

**SUPPLEMENTAL FACTS**

Defendant has written six checks totaling a substantial portion of the Benefit received, leaving a balance of $17,329.91.  *See* Carstens Aff.  Defendant cashed four checks paid to himself totaling $103,250.  *Id.* ¶¶ 5 & 6.  These checks were dated October 14 and October 16, *id.* ¶ 5, and were written after Standard demanded that he return the Benefit received.  Ver. Compl. ¶ 12.  Further, a check Defendant wrote for $17,247.78 to himself, did not clear because the original payee (Bank of America) was altered and replaced with Raleigh L. Burch.  (Carstens Aff. ¶ 6.)  The combined total for all seven checks is $171,951.86, which represents an attempt by Defendant to withdraw almost the entire Benefit from his SSA account.  (*Id.* ¶ 5.)  Without

2

one check having an altered payee, there would be virtually no money remaining in the SSA account.

**SUPPLEMENTAL ARGUMENT**

Because Defendant has now transferred a substantial portion of the Benefit from his SSA account prior to this Court scheduling a TRO hearing, Standard requests that this Court order Mr. Burch not to spend the assets in his possession or control which are traceable to the Benefit paid to Defendant.  Pursuant to this Order, Defendant should be required to provide the Court with an accounting of the funds in order to disclose what accounts within his possession or control contain the remaining Benefit.  This is necessary in order to prevent Defendant's wrongful retention of the Benefit, and the irreparable harm that Standard will suffer.  Such an order would not unduly prejudice Defendant, because he could continue to access and use other funds that are not derived from the Benefit.

Precedent cited in Standard's Memorandum of Law and the additional case law cited herein demonstrates that this Court should enter a TRO and then a preliminary injunction where a plaintiff asserts equitable claims, requests that the Court enter injunctive relief prohibiting a defendant from spending the assets in question, and then satisfies the elements necessary for a preliminary injunction and TRO.

When deciding equitable claims, the Court has the authority to "invoke equity to preserve the status quo pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested.  This nexus between the assets sought to be frozen through the interim order and the ultimate relief requested in the lawsuit is essential to the authority of a district court in equity to enter a preliminary injunction freezing assets." *United States v. Oncology Assocs., P.C.*, 198 F.3d 489, 496 (4th Cir.

1999); *see also CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) (upholding the issuance of a preliminary injunction where equitable relief is sought).  Because Standard does not seek damages stemming from legal claims and asserts equitable claims for injunctive relief and unjust enrichment, this Court has the authority to enjoin spending the assets at issue. *See Littlefield v. Tilley*, No. 2:06-0061, 2006 WL 2882735, at *6 (M.D. Tenn. Oct. 5, 2006) ("an injunction prohibiting disposition of assets derived from Defendants' alleged wrongful conduct is allowable") (attached as Exhibit B).

Instead of responding to this Action, Defendant has sought to dissipate the Benefit and therefore this Court should prevent the dissipation of these assets. *See Foltz v. U.S. News & World Report*, 760 F.2d 1300, 1306 (D.C. Cir. 1985) (court noted that a preliminary injunction is permissible "where assets necessary to satisfy a judgment were about to be removed beyond judicial reach… or about to be dissipated") (citations omitted).  As a result of this dissipation, this Court should act quickly in order to prevent Standard from suffering irreparable harm. *See, e.g., Elliott v. Kiesewetter*, 98 F.3d 47, 58 (3d Cir. 1996) ("That irreparable harm would occur absent an asset freeze is even more apparent where the very assets subject to a potential judgment will likely be dissipated without entry of the order"); *Lynch Corporation v. Omaha National Bank*, 666 F.2d 1208, (8th Cir. 1981) (district court did not abuse discretion in issuing preliminary injunction barring bank from making any distributions from escrow fund pending a final determination of the plaintiff's purchase of another corporation's assets); *Littlefield,* 2006 WL 2882735, at *6 ("the possibility of dissipating assets so that funds no longer exist in order to compensate the Plaintiffs can establish irreparable harm").  Since the Defendant moved the Benefit from the SSA to what appears to be his personal bank accounts, this Court should enjoin further moves of the remaining Benefit funds, and also require an accounting in order to ensure

that Defendant does not continue to dissipate the Benefit, leaving Standard without a remedy. Defendant could still use other assets in his possession or control and therefore would not be prejudiced. A proposed order is attached hereto for the Court's consideration.

### III. CONCLUSION

Standard has satisfied all of the requirements for injunctive relief under the law. Accordingly, it respectfully requests the Court to issue the requested relief.

Dated: October 26, 2006

Respectfully submitted,

JORDEN BURT, LLP

By: /s/ Sheila J. Carpenter
Sheila J. Carpenter (D.C. Bar No. 935742)
1025 Thomas Jefferson Street, N.W.
Suite 400 East
Washington, D.C. 20007-5208
Telephone: 202-965-8165
Facsimile: 202-965-8104
Email: sjc@jordenusa.com

Attorneys for Plaintiff Standard Insurance Company

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that a true and correct copy of the foregoing was served, first class postage prepaid and facsimile, on Maria Mena, Esq., Counsel for Defendant, 8121 Georgia Avenue, Suite 406, Silver Spring, MD 20910-4933 on this 26th day of October, 2006.

                                                                          /s/ Sheila J. Carpenter
                                                                          Sheila J. Carpenter

169770

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANDARD INSURANCE COMPANY,** ) <br> ) <br> ) <br> *Plaintiff*, ) <br> v. ) <br> ) CA No.: 1:06-CV-1755 <br> **RALEIGH L. BURCH, JR.,** ) <br> ) <br> ) <br> *Defendant.* ) <br> ) <br> ) | |

STATE OF OREGON

COUNTY OF MULTNOMAH

### Affidavit of Holly Carstens

Before me, a Notary Public in and for the State of Oregon, personally appeared, Holly Carstens, who, being by me first duly sworn, deposes and says:

1. I am over the age of eighteen, and I am otherwise competent to testify.

2. I am Senior Life Benefits Analyst for Standard Insurance Company and am employed at Standard's Home Office in Portland, Oregon.

3. As a Senior Life Benefits Analyst, I am responsible for the evaluation of and payment of benefits in connection with claims under life insurance policies issued by Standard.

4. In connection with the payment of life insurance benefits to Raleigh L. Burch, Jr. in connection with the District of Columbia's Group Policy 641332-A ("the Policy"), I have reviewed the account balances for Raleigh L. Burch's Secured Access

**Exhibit A**

Standard Account ("SSA") and copies of the checks cashed on this Account.

    5.    As of October 24, 2006, the account balance for Mr. Burch's SSA is $17,329.91. The account ledger shows that he has cashed seven checks in the following amounts for a total of $171,951.86:

    (i)    Check Number 1001, dated October 6, 2006, for the amount of $2,000.00;
    (ii)    Check Number 1002, dated October 7, 2006, for the amount of $49,454.08;
    (iii)    Check Number 1003, dated October 7, 2006, for the amount of $17,247.78;
    (iv)    Check Number 1004, dated October 14, 2006, for the amount of $50,000.00;
    (v)    Check Number 1005, dated October 14, 2006, for the amount of $50,000.00;
    (vi)    Check Number 1006, dated October 14, 2006 for the amount of $3,000.00; and
    (vii)    Check Number 1007, dated October 16, 2006, for the amount of $250.00.

    6.    My review of the copies of the cashed checks, indicates that check numbers 1003, 1004, 1005, 1006, and 1007 were all made out to Raleigh L. Burch. Check number 1002 was made out to Bank of America, and was originally returned for an irregular signature, but ultimately cleared. Check number 1001 was made out to a Ms. Shande Burch. These checks cleared on October 12, 2006, October 13, 2006, October 17, 2006 or October 18, 2006. Check number 1003 ($17,247.78) did not clear, because the payee was altered from Bank of America to Raleigh L. Burch.

    7.    A review of the back side of the checks indicates that, with the exception of Check Number 1001 and 1006, all of the checks that were made out to Mr. Burch were cashed at Bank of America.

Holly Carstens
Senior Life Benefits Analyst
Standard Insurance Company

Subscribed and sworn to before me
this 26th day of October, 2006

Notary Public
My Commission expires: 2/22/2008

OFFICIAL SEAL
CHRISTINA M HANSON
NOTARY PUBLIC - OREGON
COMMISSION NO. 377765
MY COMMISSION EXPIRES FEB. 22, 2008

169792

Slip Copy
Slip Copy, 2006 WL 2882735 (M.D.Tenn.)
(Cite as: 2006 WL 2882735 (M.D.Tenn.))
H

Page 1

Only the Westlaw citation is currently available.

United States District Court,
M.D. Tennessee,
Cookeville Division.
Doug LITTLEFIELD, Robert Molleur and Rodney Barrup, Plaintiffs,
v.
Carl Benson TILLEY, Katherine Tilley, Tilley Foundation, Inc., a Tennessee Corporation, and CT Technology, Inc, Nevada Corporation, Defendants.
No. 2:06-0061.

Oct. 5, 2006.
G. Kline Preston, IV, Preston Law Group, P.C., Nashville, TN, Nashville, TN, for Plaintiffs.

Henry D. Fincher, Cookeville, TN, for Defendants.

*MEMORANDUM*

ROBERT L. ECHOLS, District Judge.

*1 Pending before the Court is the "Application for Preliminary Injunction" (Docket Entry No. 2) filed by Plaintiffs Doug Littlefield ("Littlefield"), Robert Molleur ("Molleur"), and Rodney Barrup ("Barrup") which seeks to enjoin the Defendants Carl Benson Tilley ("Carl Tilley" or "Tilley"), Katherine Tilley (collectively the "Tilleys"), the Tilley Foundation Inc. ("Tilley Foundation") and CT Technology, Inc. ("CT") from selling any shares in the Tilley Foundation or dissipating or encumbering its assets during the pendency of this litigation.

An evidentiary hearing was held on September 29, 2006. The Tilleys did not appear, even though their presence was not excused by the Court.

I. BACKGROUND
Plaintiffs are owners of unregistered securities in the Tilley Foundation. Carl Tilley and his wife Katherine are directors of that foundation who allegedly have wrongfully transferred assets from the foundation to themselves.

Plaintiffs claim they purchased shares in the Tilley Foundation based upon continued and repeated fraudulent representations made by Carl Tilley that he owned new patentable technology which allowed electric vehicles and other electric motors to run on batteries without being recharged by an outside source. According to the Plaintiffs, money garnered from the sale of the stock in the Tilley Foundation was used by the Tilleys to enrich themselves.

Plaintiffs' Verified Complaint is in eight counts. Those counts include allegations of fraud and deceit (Count One); breach of fiduciary duty (Count Two); conversion (Count Three); an action for accounting (Count Four); and violations of the Tennessee Securities Act (Count Five), the Tennessee Consumer Protection Act (Count Six), and the Racketeer Influenced and Corrupt Practices Organization Act (Counts Seven and Eight).

At the evidentiary hearing, the Court heard from several witnesses, including named Plaintiffs and other investors. That testimony supported the bulk of the allegations made by the Plaintiffs in their Verified Complaint. Based upon the Verified Complaint and the testimony of the witnesses presented, the Court finds the following to be the relevant facts.

II. *FACTUAL FINDINGS*
Each of the Plaintiffs is a citizen and resident of Vermont. The individual Defendants are residents and citizens of Tennessee. The Tilley Foundation is a Tennessee Corporation and CT is a Nevada corporation.

The underpinnings of this case relate to the sale and purchase of stock in the Tilley Foundation based upon Carl Tilley's alleged "patentable invention" of a re-energizing device based upon batteries. The Court will identify this invention as "the device," "the invention," or "the new technology." In doing so, the Court is not attempting to be obtuse or cryptic because all the Court knows is that the invention is some device secreted in a black box which somehow is supposed to re-energize batteries without the use of an external charging source. [FN1] Supposedly, the self-contained device would allow electric automobiles to travel hundreds or thousands of miles without external recharging. The device could also be used to propel golf carts, four

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**Exhibit B**

Slip Copy
(Cite as: 2006 WL 2882735, *1 (M.D.Tenn.))

Page 2

wheel all-terrain vehicles, and bicycles, using the same technology. A variation of the device would supposedly supply all of the electrical needs of a home without the use of wind or solar power.

> FN1. Apparently this was about all the investors knew about the invention, although they all initially believed that the invention was a break-through, or as Plaintiff Molleur described it, "the best thing since sliced bread."

*2 The device was never patented. Carl Tilley repeatedly explained to his investors that patents were extremely expensive to defend and instead the device was protected as a "trade secret." This, according to Tilley, was a less costly way of protecting the invention because money would not have to be expended in obtaining a patent and in defending the patent against anticipated litigation. Additionally, investors were told that by having the device protected as a "trade secret," there would be less chance that it would be stolen or copied and used by others.

With the hope that the invention would revolutionize the electric motor industry, investors purchased shares in the Tilley Foundation. The Tilley Foundation authorized a total of 1,000 shares which were generally sold for $1,000 per share.

Plaintiff Littlefield owns 100 shares of stock, which he received in exchange for working for the Tilley Foundation. This work consisted of some administrative tasks, but primarily involved efforts to sell the stock to others and find investors for the new technology. In fact, it was Littlefield who sold shares to his co-Plaintiffs, with Molleur purchasing 115 shares at $1,000 per share, and Barrup purchasing 45 at the same price per share.

Littlefield also sold shares to other investors in Vermont and Canada. For each share he sold, Littlefield received a commission of 10%, even though he was not licensed to sell securities. Littlefield estimates that approximately 900 shares of the 1,000 available shares have been sold.

Littlefield also had some contact with potential investors. At one point he was in negotiations to sell the new technology to a Brazilian bank consortium for five billion dollars. On another occasion, he was in negotiations to sell the technology to Boeing Phantom Works, a developmental arm of the Boeing Company. On still another occasion, there were negotiations with Bombardier for the purchase of the new technology for its use in all-terrain vehicles. None of these deals panned out, although the deals were touted by Tilley as showing the value of the invention and used by him to have investors buy more shares or to induce new investors to purchase shares.

There were other alleged attempts to sell the technology. Carl Tilley informed stockholders that he had a group from North Carolina which was interested in purchasing the device for four billion dollars. However, when the group arrived at the Tilley Foundation in Lebanon, Tennessee, it dropped the offer to 900 million. The next day the group returned and offered $1.3 billion but Carl Tilley rejected it because he had allegedly found a group of Native American investors from Alabama who were interested in purchasing the device for eight billion dollars.

This group, the Cickamugan and Etowah of the Southern Cherokee Nation of Jackson County, purportedly was ready to enter into a "Treaty" with the Tilley Foundation in November, 2003, whereby it would purchase the invention, with the funds to be secured by a 12 billion dollar account. [FN2]

> FN2. Under the proposed "Treaty," this amount was to be generated by the group paying into the account ninety million dollars per week for forty weeks.

*3 Tilley apparently went to great lengths in order to prove the efficacy of this deal. He and Steve Sloan, a shareholder and former Board Member of the Tilley Foundation, traveled to some place in Jackson County, Alabama [FN3] where they met with Chief Obobaway R. Griggs. Apparently in an effort to show his group had the wherewithal to make the purchase, Chief Griggs took Tilley and Sloan to a guarded "customs" house on the reservation where Sloan saw pallets stacked with United States currency wrapped in cellophane.

> FN3. At the hearing, Sloan could not identify the city. He indicated it was somewhere between Birmingham and Montgomery, Alabama.

Tilley informed stock holders that the Native American group had agreed to purchase the device

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy  
(Cite as: 2006 WL 2882735, *3 (M.D.Tenn.))

Page 3

for eight billion dollars and alternatively told them that 20% or 40% or 80% of that amount was already in the bank. Later he told the group that Homeland Security was looking into the legality of the deal and later still that the "federal securities commissioner" was on vacation.

As with the other supposed deals, this deal was never consummated. However, Tilley used the prospects of such a deal not only to lure new investors, [FN4] but also to quiet any qualms investors may have had. He talked of the invention making them rich.

> FN4. In fact, Durwood Brantley purchased two shares at this time for $7,500 each, instead of the normal $1,000 per share. The cost per share was more because Tilley supposedly had a "provisional patent" and a deal with the Native Americans for the purchase of the device. When asked why he would be willing to sell two shares for $15,000 when those shares would be worth $7.5 million upon completion of the sale to the Native American group, Tilley explained that he was broke and needed an infusion of money for the deal to go through. Besides, he said, when the deal was finalized, he would have more money than he could ever need. All totaled, Brantley bought 46 shares, paying cash for those shares because Tilley did not have a bank account.

Tilley also lulled investors into complacency by running assorted tests which suggested, at least to some extent, that the device actually worked. In this regard, Tilley outfitted a DeLorean automobile with the device and tested it at the Nashville Speedway. The vehicle only ran for a very short period before stopping, ostensibly because of a faulty rear wheel bearing.

Tilley also told some investors the device was being tested on a 4,000 square foot home and was powering the home's electricity. This statement was not true.

All of the tests which were performed on the device were done under Carl Tilley's direction and utilizing his parameters. He controlled the tests and no outside tests were ever allowed. Carl Tilley refused outside testing even though shareholders repeatedly requested independent verification which would show whether the device actually worked, and even though several of the potential buyers indicated they would only be interested in purchasing the device if an independent test showed the device would work as promised. From both the investors' and potential buyers' perspectives, the key to the success of the device would be its ability to regenerate batteries for some length of time. However, nobody was ever allowed by Tilley to conduct longevity tests.

The Tilleys utilized at least some of the proceeds from the sale of shares in the Tilley Foundation to meet their financial needs. They purchased and placed a modular home on their lot at 131 Hiwasee Road in Lebanon, Tennessee. They also built a 30' x 60' workshop and a brick corporate headquarters on the land.

On May 29, 2003, the Tennessee Bureau of Investigation ("TBI") raided the property on Hiwasee Road and confiscated numerous items, including one or more variations of the device. After the raid by the TBI, the rights and technology relating to the device were assigned to CT. The members of that partnership are the shareholders in the Tilley Foundation with their partnership interest in CT equivalent to the percentage of shares they have in the Tilley Foundation. CT has no assets other than the ownership right to the new technology.

*4 As a result of the TBI raid, Carl Tilley was charged with theft, securities fraud, and the sale of unregistered securities. He pled guilty to the sale of unregistered securities and the other charges were dismissed. Carl Tilley was placed on probation for two years and prohibited from selling unregistered securities during that period.

The evidence before the Court suggests that Carl Tilley has sold unregistered securities in violation of the conditions of his probation. Durwood Brantley testified that he purchased 44 shares from Carl Tilley between November 2005 and March 2006. [FN5]

> FN5. In an Affidavit filed in support of his Motion to Dismiss, Carl Tilley attached a copy of his guilty plea. Although that document is undated, Tilley states in his Affidavit that he entered into the "judicial diversion" at some time in 2005. (Docket Entry No. 10, Tilley Aff. ¶ 6 & Ex. 1 thereto).

The Tilleys apparently have already left, or are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy  
(Cite as: 2006 WL 2882735, *4 (M.D.Tenn.))

Page 4

intending to leave, Tennessee. They apparently have purchased land in Nebraska.

### III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 65(b), the Court may grant a preliminary injunction if it clearly appears from specific facts shown by testimony, affidavits or a verified complaint that immediate and irreparable injury, loss or damage will result to the applicant. In deciding whether to grant a preliminary injunction, the Court must consider four factors: (1) whether the party seeking the order has a strong likelihood of prevailing on the merits of the case; (2) whether the moving party will suffer irreparable injury if the order is not entered; (3) the potential harm the order would cause others; and (4) the public interest. *See Leary v. Daeschner,* 228 F.3d 729, 736 (6th Cir.2000). Security can be required for the issuance of a preliminary injunction. Fed.R.Civ.P. 65(c).

### IV. APPLICATION OF LAW

The Court finds that Plaintiffs are entitled to a preliminary injunction because they have shown a likelihood of success on the merits, they will likely suffer immediate and irreparable injury which outweighs the potential harm to the opposing party, and a preliminary injunction is in the public interest under the facts of this case.

#### A. Propriety of Injunctive Relief

It is axiomatic that equitable relief is only available where there is no adequate remedy at law. Cases in which the remedy sought is merely the recovery of money damages do not fall within a court's equity jurisdiction. In this vein, the Supreme Court in *Groupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308 (1999) held that a "district court has no authority to issue a preliminary injunction preventing [defendants] from disposing of their assets pending adjudication of plaintiffs' contract claim for money damages" because unsecured creditors had no such remedy at common law. *Id.* at 333. However, in doing so, the Court made a critical distinction between general, unsecured creditors and those possessing equitable interests in the property at issue. *Id.* at 324-26. "Indeed, courts since *Groupo Mexicano* have consistently found that where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets." *Quantum Corp. Funding, Ltd. v. Assis You Home Health,* 144 F.Supp.2d 241, 250 n. 9 (S.D.N.Y.2001)(collecting cases).

*5 Here, in addition to claims for money damages, Plaintiffs seek dissolution of the Tilley Foundation and have asserted claims as shareholders of the Tilley foundation for unjust enrichment, fraud and deceit, and breach of fiduciary duty. Such claims are equitable in nature, and therefore an injunction prohibiting disposition of assets derived from Defendants' alleged wrongful conduct is allowable. *See, McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.,* 339 F.3d 1087, 1093 (9th Cir.2003)(emphasizing that shareholder's claim of "unjust enrichment is an equitable remedy"); *Caudill v. Eubanks Farms, Inc.,* 301 F.3d 658, 664 (6th Cir.2002)(noting that claims for dissolution of corporation are equitable); *Comverse Technology, Inc. Derivative Litigation,* 2006 WL 2568461 at *1 (S.D.N.Y.2006)(*Groupo Mexicano* did not bar injunction where claims were for unjust enrichment).

#### B. Likelihood of Success on the Merits

"In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. CAFCOMP Systems,* 119 F.3d 393, 407 (6th Cir.1997). "However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair grounds for litigation and thus for more deliberate investigation." *Id.*

In their Verified Complaint, Plaintiffs have presented assorted claims for relief, including fraud which "requires proof of a successful deception and action taken by the person deceived that would not have otherwise been taken," *Houghland v. Houghland,* 2006 WL 2080078 at *3 (Tenn.Ct.App.2006) and conversion which requires a showing of the appropriation of property in defiance of the true owner's rights, *State ex rel. Flowers v. Tennessee Coordinated Care Network,* 2005 WL 427990 at *7 (Tenn.Ct.App.2005). Plaintiff also allege a violation of the federal RICO statute which requires them to prove "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." *Sedima, S.P.R.L v. Imrex Co.,* 473 U.S. 479, 496 (1985) and a violation of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy  
(Cite as: 2006 WL 2882735, *5 (M.D.Tenn.))

Page 5

the Tennessee Consumer Protection Act which is a claim "much broader than that of common law fraud," and requires proof that the defendant engaged in an unfair or deceptive act or practice within the ambit of the Act [FN6] which caused damage. *Tucker v. Sierra Builders,* 180 S.W.2d 109, 116 (Tenn.Ct.App.2005).

> FN6. Defendants' Motion to Dismiss the TPCA claim on the ground this case involves the sale of securities was denied by this Court (Docket Entry No. 23) in light of *Johnson v. John Hancock Funds,* 2006 WL 1464802 (Tenn.Ct.App.2006) which held that the TPCA is broad enough to cover securities claims.

Given these claims, Plaintiffs have established a likelihood of success on the merits, or at least raised questions in relation to the merits of some of their claims. The evidence at the evidentiary hearing suggests that the Tilleys have engaged in fraud with the intent to capitalize on that fraud. They purport to have a device worth billions of dollars yet will not let it be tested to see if it works. They repeatedly claim that a deal worth billions is on the cusp of closing, but the deals never materialize. Despite no tests which show the device works, and no clear evidence that the device is even marketable, the Tilleys have shown a lack of compunction when it comes to accepting money from investors. They accept that money even though the money is presented to purchase stocks which are not registered. The Court finds that this factor weighs in Plaintiff's favor.

B. *Irreparable Harm*

*6 " 'As a general rule, a movant has not established irreparable harm where damages would adequately compensate the movant for the asserted harm.' " *Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1381 (6th Cir.1995) (citation omitted). Nevertheless, "[a] n injunction may issue to protect assets that are the subject of the dispute or to enjoin conduct that might be enjoined under a final order." *In re Fredeman Litigation,* 843 F.2d 821, 825 (5th Cir.1988). Hence, the possibility of dissipating assets so that funds no longer exist in order to compensate the Plaintiffs can establish irreparable harm. *See, In re Focus Media, Inc.,* 387 F.3d 1077, 1086 (9th Cir.2004) (bankruptcy court properly entered preliminary injunction where evidence showed that assets were being dissipated by primary shareholder); *FDIC v. Garner,* 125 F.3d 1272, 1279-80 (9th Cir.1997) (giving "substantial deference" to lower court's finding that there was "at least a possibility" of dissipation of assets absent an asset-freezing injunction, and consequently concluding that the possibility of irreparable injury had been adequately demonstrated); *Elliott v. Kiesewetter,* 98 F.3d 47, 58 (3d Cir.1996)("That irreparable harm would occur absent an asset freeze is even more apparent where the very assets subject to a potential judgment will likely be dissipated without entry of the order").

In this case, evidence has been presented which indicates that the Tilleys may dissipate the assets of the Tilley Foundation. They previously used the Foundation's assets to build on their lot in Lebanon, Tennessee, although it is not clear that they were entitled to do so. There is also some evidence which suggests the Tilleys may have moved to Nebraska and that Carl Tilley is still selling stocks in the Tilley Foundation. [FN7]

> FN7. To the extent this factor may be deemed inconclusive, the Court notes Plaintiffs are not required to establish each element in order to obtain a preliminary injunction. Instead, the Court is to look at all of the factors and balance them. *See, Six Clinics Holding Corp., II,* 119 F.3d at 400 ("The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met").

C. *Substantial Harm To Others*

The third factor the Court must consider is whether the issuance of a preliminary injunction will cause "substantial harm to others." *Leary,* 228 F.3d at 736 . "This requires a court to balance the harm a plaintiff would suffer if its request for a preliminary injunction was denied with the harm the defendants would suffer if they were to be temporarily enjoined." *Sawyer,* 2006 WL 1638537 at *8. "It also requires a court to assess the impact a preliminary injunction might have on relevant third parties." *Id* .

Plaintiffs have shown they will suffer irreparable harm if the Tilleys are not enjoined because Carl Tilley will deplete or encumber whatever assets

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: 2006 WL 2882735, *6 (M.D.Tenn.))

Page 6

remain of the Tilley Foundation, including the real estate. Although the Defendants had an opportunity to present whatever evidence they desired at the preliminary injunction hearing, they voluntarily chose not to attend. The Court also has no evidence before it which would suggest that any relevant third parties would be harmed by the issuance of a preliminary injunction. Consequently, this Court concludes that the evidence favors the Plaintiff with regard to this factor.

D. *Public Interest*

*7 The last factor in determining whether to grant a preliminary injunction "asks whether the public interest is advanced in issuing" the order. *National Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 372 F.3d 712, 720 n. 4 (6th Cir.2003). This has been described as a "somewhat nebulous" factor. *Sawyer*, 2006 WL 1638537 at * 8.

On the one hand, if the invention works as portrayed by Carl Tilley, the device could be a boon to the energy market. On the other hand, "the public has an interest in discouraging unfair trade practices[.]" *Hoover Trans. Serv's. V. Frye*, 77 Fed. Appx. 776, 784 (6th Cir.2003). This includes, of course, selling stock based upon false pretenses and misrepresentations.

Given that no tests have ever been done which would support the conclusion that the device works as promised by Carl Tilley, and further given the fact that repeated sales have been made based upon deals which never came to pass and on tests which never occurred, the Court finds the public interest would be served by an injunction which prohibits the Tilleys from selling any more shares in the Tilley Foundation pending further order of the Court. This is particularly so since Carl Tilley is not allowed to sell securities under the terms of his probation.

E. *Scope of the Restraining Order*

Based upon the foregoing, the Court finds a balancing of the four factors to be considered in ruling on a motion for a preliminary injunction support the issuance of an injunction. Accordingly, the Court turns to the scope of the injunction.

"The purpose of a preliminary injunction is simply to preserve the status quo." *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir.2004). In this case, the Court finds that the status quo pending litigation of the issues involved in this case will be served by preventing the Defendants from concealing and dissipating the assets of the Tilley Foundation and prohibiting them from selling any shares or interests in the Tilley Foundation.

F. *Security*

Rule 65(c) of the Federal Rules of Civil Procedure provides that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). "While ... the language of Rule 65(c) appears to be mandatory, and ... many circuits have so interpreted it, the rule in [the Sixth Circuit] has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus. Inc.*, 55 F.3d 1171, 1176 (6th Cir.1995).

In this case, the Court exercises its discretion by determining that security is appropriate to insure against any damages that the Tilleys may incur as a result of being unable to utilize the assets of the Tilley Foundation and/or being unable to sell shares or interests in that entity. The security to be provided by Plaintiffs shall be in the amount of $50,000.00.

G. *Appointment of a Receiver*

*8 In its Application for Preliminary Injunction, Plaintiffs ask that a receiver be appointed to marshal the assets of the Tilley Foundation and to account for the monies unlawfully obtained from it. The statutory basis for this request is not stated in the Application, although in the Verified Complaint the Plaintiffs reference T.C.A. § 48-24-303.

The cited statutory provision allows for the appointment of a receiver in an action brought to dissolve a corporation. In this case, the Plaintiffs allege in Count IX of their Verified Complaint that judicial dissolution of the Tilley Foundation is appropriate pursuant to T.C.A. § 48-24-301(2)(B) which allows for dissolution upon a finding that "[t]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy  
(Cite as: 2006 WL 2882735, *8 (M.D.Tenn.))

Page 7

he directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent."

While this Court has referenced what the evidence thus far has shown in relation to Carl Tilley's representations about the device, the Court has made no definitive findings that he has engaged in illegal, oppressive or fraudulent activity. Moreover, the Court does not know for a fact that he, his wife, or the two in tandem are actually in control of the corporation. In fact, the evidence suggests that Carl Tilley is now a minority shareholder in the Tilley Foundation, owning only thirty of the 1,000 outstanding shares. It is far too premature to make a determination as to whether the Tilley Foundation should be dissolved.

Moreover, the appointment of a receiver under T.C.A. § 48-24-303 requires notice to all parties to the proceeding and any interested person designated by the Court. At the preliminary injunction hearing, several of the investors testified but there is a dearth of evidence regarding their feelings as to dissolution of the Tilley Foundation. Additionally, there are shareholders in the Tilley Foundation who were not heard by the Court.

Given the state of the record the request for the appointment of a receiver will be denied.

## IV. CONCLUSION

On the basis of the foregoing, the Court will enter a preliminary injunction to maintain the status quo. That Order will prohibit Carl and Katherine Tilley from concealing and dissipating the assets of the Tilley Foundation and/or selling share or interests in that corporate entity. Plaintiffs' request for the appointment of a receiver will be denied.

An appropriate Order will be entered.

Slip Copy, 2006 WL 2882735 (M.D.Tenn.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANDARD INSURANCE COMPANY,**<br><br>*Plaintiff*,<br>v.<br><br>**RALEIGH L. BURCH, JR.,**<br><br>*Defendant*. | CA No.:  1:06-CV-1755 |

**TEMPORARY RESTRAINING ORDER**

WHEREAS, the Court has considered the Verified Complaint, sworn to October 13, 2006, Plaintiff Standard Insurance Company's ("Standard") Application for a *Temporary Restraining Order,* and the Memorandum of Law and Supplemental Memorandum of Law submitted in support thereof, and the [lack of] Opposition thereto, and the Court has found that, absent such an interim order, Plaintiff will suffer immediate and irreparable harm before a hearing can be had on Plaintiff's Motion for Preliminary Injunction, in that there is a substantial likelihood that Defendant will spend the Benefit and Standard will be unable to reclaim it; there is a substantial likelihood that Standard will prevail on the merits; an injunction will not substantially injure Defendant because Standard is not requesting to constrain any assets besides the Benefit paid; and further that an order of limited duration should be entered in order to preserve the *status quo*, and

WHEREAS, the Court is of the opinion that the temporary restraining **order** should be issued; NOW, THEREFORE, IT IS ORDERED THAT:

      1.      The Defendant is enjoined from removing the remaining Life Insurance Benefit ("the Benefit") paid by Standard, or any portion of it, from the interest bearing Standard Secure Access Account ("the Account") which Standard established so that Defendant could cash checks on the Benefit following the death of Defendant's spouse Account. Defendant is further enjoined from spending or transferring any funds from the Benefit that once were in or are now in any bank account, investment account or other financial account within Defendant's possession or control;

      2.      The Defendant is ordered to file an accounting with the Court detailing how the Defendant has spent the Benefit, and the location of funds from the Benefit (including the name and address of the financial institution, along with any account numbers) no later than November ___, 2006;

      3.      The Temporary Restraining Order will remain in full force and effect through and including a hearing before this Court on Standard's request for the entry of a preliminary injunction. The hearing will take place on _____, 2006.

      4.      This Order is conditioned upon Standard giving security on or before November ____, 2006, at 5:00 p.m. by filing a bond in the amount of _____ Dollars for such costs as maybe incurred by Defendant if he is found to have been wrongfully restrained.

Dated:  Washington, D.C.
         _____ October, 2006
         _____ AM/PM

                                                _____
                                                United States District Judge

169814

Case 1:06-cv-01755-RMC   Document 6-4   Filed 10/26/2006   Page 3 of 3