**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| **STANDARD INSURANCE COMPANY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 06-1755 (RMC)** |
| ) | |
| **RALEIGH L. BURCH, JR.,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**MEMORANDUM OPINION**

Standard Insurance Company of Portland, Oregon, ("Standard") provides group life insurance to employees of the District of Columbia, including the District of Columbia Public Schools ("DCPS").  Notified by DCPS that teacher Priscilla Davila-Burch had died, with a packet that included a death certificate and a designation of beneficiary form, Standard quickly distributed insurance proceeds to the two daughters and husband of Ms. Davila-Burch.  Much to Standard's chagrin, one of the daughters then provided an updated beneficiary designation form which omitted Mr. Burch and directed that the insurance be evenly split between the two daughters.  Examining and crediting the second designation form, Standard then attempted to contact Mr. Burch by phone, letter and, finally, lawsuit to recover the $172,033.99 paid to him.  Standard now asks the Court for a declaratory judgment that the second beneficiary designation form is valid and a ruling that Mr. Raleigh L. Burch, Jr. has been unjustly enriched by the monies he has refused and failed to return. Standard, Mr. Burch, Mrs. Kimberly (Davila) Leftenant, and Ms. Ehuniz Davila, all represented by counsel, were parties to a two-day bench trial.

From the evidence of record, including the demeanor and credibility of the witnesses, the Court finds that Priscilla Davila-Burch executed the second beneficiary designation form prior to her death and delivered it to DCPS. Therefore, according to the terms of the policy, Mses. Davila and Leftenant are the only proper recipients of insurance proceeds. Mr. Burch has been unjustly enriched by holding, and spending, the insurance proceeds which, despite a court injunction to the contrary, were severely depleted.

## I. FINDINGS OF FACT

1.  The relevant insurance policy between Standard and the District of Columbia ("D.C.") is dated March 1, 2001, and had a policy number of 641332-A ("Policy"). *See* Plaintiff's Exhibit ("Pl.'s Ex.") 1. Under the Policy, a "beneficiary" was "a person you name to receive death benefits." *Id*. at 18.

2.  A person insured under the policy "may name or change Beneficiaries at any time without the consent of a Beneficiary." *Id*.

2.  To change a Beneficiary designation, an insured employee had to submit a designation form that was: (1) dated and signed by the insured; (2) delivered to the Policyowner or Employer (DCPS) during the insured's lifetime; and (3) related to the insurance under the Policy. *Id*. at 19. In such an event, the change in designation of Beneficiary took place upon delivery of the form to DCPS. *Id*.

3.  The Policy granted significant authority to Standard to determine its administration. Standard retained "full and exclusive authority to . . . resolve all questions arising in the administration, interpretation, and application" of the Policy. *Id*. at 20. This included the "right to determine: . . . b. [e]ntitlement to benefits; . . . [and] d. [s]ufficiency and the amount

of information we may reasonably require to determine . . . b. . . . above." *Id.*

4.   Ms. Priscilla Davila-Burch was a teacher with DCPS who was covered by the Policy.  She married Raleigh L. Burch, Jr., in December 1999 and, in completing a Beneficiary Designation Form in 2004 ("2004 Designation Form"), identified Mr. Burch as the beneficiary for 50% of her life insurance benefits, with 35% distributed to her younger daughter, Ehuniz, and 15% to her older daughter, Kimberly.  *See* Pl.'s Ex. 6 (2004 Designation Form).

5.   Ms. Davila-Burch left her husband in August 2005.  On August 29, 2005 Mr. Burch signed a civil protection order to stay away from Ms. Priscilla Davila-Burch for a period of 12 months.  *See* Davila Defendants' Exhibit ("Davila Ex.") 4.  Ms. Davila-Burch filed a complaint for legal separation on August 29, 2005.  *See* Davila Ex. 5.   She and daughter Ehuniz Davila moved to a different home and Ms. Davila-Burch began to drop "Burch" from her last name, although she had not formally divorced Mr. Burch.  *See id.* (Ms. Davila-Burch choosing to "return to [her] birth name or another legal name [she] used before [her] marriage" and writing Priscilla Durham-Davila).

6.   Ms. Davila-Burch suffered from Hepatitis-C and, starting in January 2006, was repeatedly hospitalized.  During one of those hospitalizations, in March 2006, she directed her daughter Ehuniz to bring certain papers to the hospital; these included an application for disability retirement from DCPS and a Beneficiary Designation Form ("2006 Designation Form").

7.   Ehuniz Davila filled out the top portion of the 2006 Designation Form at her mother's direction, although she did not understand the nature of the form.  She erred in inserting a social security number and just crossed it out.  When Kimberly Leftenant came to visit her

mother in the hospital, she completed parts of the form as well. Mrs. Leftenant departed and, at some point, Ms. Priscilla Davila-Burch signed the form in the presence of her mother, Barbara Durham, and attending nurse Laura Greer, who each signed as witnesses. *See* Pl.'s Ex. 6 (2006 Designation Form).

8.    During that hospitalization, on March 5, 2006, Mr. Burch and his son came to visit Ms. Davila-Burch. No other family member was present.

9.    Priscilla Davila-Burch was released from the hospital and, on March 18, 2006, delivered the 2006 Designation Form and the disability application form to the Human Resources office of DCPS. The 2006 Designation Form was stamped by DCPS as received on March 18, but was attached to, and behind, the disability application form in her file.

10.    Ms. Davila-Burch was hospitalized for the last time in April 2006 and passed away on April 10, 2006.

11.    Daughters Kimberly and Ehuniz did not alert Mr. Burch to their mother's extreme condition and he was not present at her death. He continues to harbor resentment towards the two women as a result. Except at Ms. Davila-Burch's funeral, when he agreed to assign some of the insurance proceeds to cover the costs, Mr. Burch has not spoken to either of his step-daughters.

12.    In April 2006, Mrs. Leftenant and Ms. Davila went to the Human Resources office of DCPS to report that their mother had died and to ascertain information about claiming her life insurance benefits. They spoke with Ms. Mary Green, a human resources retirement specialist, who looked in Ms. Davila-Burch's file and located the 2006 Designation Form attached to the now-defunct disability application form. Because they were the named

beneficiaries, Ms. Green copied the 2006 Designation Form and gave it to Mrs. Leftenant. The original has never been seen since.

13.   By letter dated September 12, 2006, and received by Standard on September 18, 2006, DCPS submitted a death claim for "Priscilla Burch-Davila."[1]  Included in the packet of information sent to Standard was an SF-1276 Designation of Beneficiary form that indicated that Mr. Burch was to receive 50% of the insurance proceeds, Mrs. Kimberly Leftenant was to receive 15% of the insurance proceeds, and Ms. Ehuniz Davila-Burch was to receive 35% of the insurance proceeds.  *See* Pl.'s Ex. 2 at 9.  The form was dated September 5, 2004, had been signed by "Priscilla Davila-Burch," and was accepted at DCPS September 30, 2004.  *Id*. ("2004 Designation Form").  Holly Carstens, Senior Life Benefits Analyst, was assigned to review the file.[2]

14.   On September 29, 2006, Standard issued benefit payments in the amounts of $123,200.00 to Ms. Ehuniz Davila, $53,887.15 to Mrs. Kimberly Leftenant, and $172,033.99 to Mr. Burch.  Mr. Burch executed an assignment by which $3,966.01 of insurance proceeds he would otherwise have received were paid to Stewart Funeral Home for Ms. Priscilla Davila-Burch's funeral.  *See* Pl.'s Ex. 3.  The total claim payment amount was $353,087.15.  *Id.*  For each beneficiary, Standard sent an accompanying letter explaining the benefits and stating

---

[1]  The deceased was named Priscilla Davila before her 1999 marriage to Defendant Raleigh L. Burch, Jr.  Because her surname "Davila" preceded her marriage to Mr. Burch, the Court concludes that her name was Priscilla Davila-Burch and uses this name throughout this opinion, although not all documents concur.  Mr. Burch adopted Ehuniz Davila who, therefore, for a period of time went by the name Ehuniz Davila-Burch.  Ehuniz Davila appears to have dropped the use of "Burch."

[2]  Ms. Carstens's notations on September 25, 2006, indicate that legal documents do not support that Burch was "legally" Ms. Ehuniz Davila's last name.  *See* Pl.'s Ex. 5.

that the proceeds had been placed in a Standard Secure Access, interest-bearing draft account, to which access could be made by simply writing a check on the checkbook which was about to be delivered. *See id*.

15.    On October 2, 2006, Mrs. Kimberly Leftenant responded to the letter from Ms. Carstens and called to inquire why she had not received a full 50% distribution of the proceeds from her mother's life insurance policy.   Learning that Ms. Carstens had relied on the 2004 Designation Form, Mrs. Leftenant informed Ms. Carstens that a new beneficiary designation form had been signed by Priscilla Davila-Burch on March 2, 2006.  At Ms. Carsten's request, on October 3, Mrs. Leftenant's husband faxed a copy of the 2006 Designation Form to Standard.

16.    Ms. Carstens promptly left a voice message and faxed the 2006 Designation Form to Alicia Davis-Waters, her contact at DCPS, because Standard had not earlier received the form and could not read the date-stamp indicating the date on which it was received by DCPS.  Ms. Carstens's fax message stated, in part, "Kimberly states that the date is actually 3/18/06, which appears to be prior to the member's death.  Kimberly stated that . . . when she filed the [death] claim with DCPS a Ms. Reed gave her a copy of this designation for her records." Pl.'s Ex. 4. *But see* Pl.'s Ex. 5 (Ms. Carstens's notes indicating that *Mr*. Leftenant told her that the date was 3/18/06 and that Ms. Reed had given Ms. Leftenant a copy of the designation.)

17.    On that same date, October 5, 2006, Ms. Carstens left a voice message for Mr. Burch at his home, asking him to call her.  He did not return the call.  Mr. Burch testified that he has a voicemail machine but that he does not customarily listen to his voice messages and did not

hear this one.

18.     On October 6, Mr. Burch wrote a $2,000 check (#1001) from the Standard account for his

        natural daughter Shande.  *See* Pl.'s Ex. 12.

19.     On October 7, Mr. Burch wrote a check for $49,454.08 (#1002) to Bank of America to pay

        off his home equity line of credit in full.  On that same date, he wrote a check (#1003) in the

        amount of $17,247.78 for deposit in his Bank of America checking account; this check was

        returned and not processed.  *See id*.

20.     On October 12, 2006, Attorney Neil A. Beauchamp of Standard sent a letter to Mr. Burch by

        Federal Express, notifying him that Standard had received information that the proceeds paid

        to him "were paid in error" because Mr. Burch was not a named beneficiary on the 2006

        Designation Form.  Pl.'s Ex. 6.  Mr. Beauchamp asked that Mr. Burch "[p]lease immediately

        refund $172,033.99 to Standard Insurance Company."  *Id.*   Mr. Burch testified that he never

        received this letter, contradicting an affidavit and delivery form supplied by FedEx.[3]  *See*

        Pl.'s Ex. 7a. (shipment receipt showing that the package was delivered October 13, 2005 at

        10:20 a.m.)  For reasons explained further below, the Court discredits Mr. Burch's testimony

        and finds that the FedEx letter was delivered on October 13, 2006.

21.     On the very next day, October 14, 2006, Mr. Burch wrote a total of $103,000.00 in checks

        off the Standard account.  Checks ## 1004 and 1005 were each in the amount of $50,000 and

        were deposited in Mr. Burch's personal checking account at Bank of America.  (He testified

---

[3]  Asked by interrogatory when this letter was delivered to his home, Mr. Burch objected
that the question "seeks information that is not relevant to the subject matter of this lawsuit, nor
is in [sic] reasonably calculated to lead to the discovery of relevant information" and, tellingly,
provided no further answer.

that he had intended to deposit one check at Bank of America and one check at Chevy Chase Bank and could not explain why both ended up at Bank of America.)  Check # 1006 was in the amount of $3,000.00.  Mr. Burch could give no specific reason for the withdrawal of these monies from the Standard account at that time.

22.     Standard filed this suit on October 16, 2006 and sought a temporary restraining order ("TRO") and preliminary injunction to prevent the dissipation of assets held by Mr. Burch on October 17, 2006.  *See* ECF Dkt. ## 1 & 4.[4]

23.     On October 16, 2006, counsel for Standard left messages for Mr. Burch at his home and work site concerning the lawsuit but never received any return calls.  Mr. Burch did not testify specifically about these messages.

24.     On October 16, 2006, Mr. Burch cashed a check in the amount of $250 (#1007), the minimum amount that could be withdrawn from the Standard account.

25.     On October 17, 2006, Mr. Burch was served at his work site with the complaint and motion for a TRO.

26.     On October 20, 2006, Mr. Burch wrote a check for legal services in the amount of $15,000 from his Bank of America account.  *See* Pl.'s Ex. 8c.

27.     On October 25, 2006, Mr. Burch withdrew $25,000 from his Bank of America account and deposited it into his Chevy Chase Bank account.  *See* Pl.'s Ex. 9.

28.     On October 26, 2006, Mr. Burch wrote a check in the amount of $7,329.00 on the Standard account (# 1010) and deposited it into his Bank of America checking account.  *See* Pl.'s Ex.

---

[4]  This notation is a reference to this Court's electronic case management system, and the Court properly takes judicial notice of these filings by Plaintiff Standard.

12.

29.     On October 31, 2006, there was a TRO hearing before the Court, in which Standard and Mr.

Burch (personally and through counsel) appeared.   The Court issued a Temporary

Restraining Order enjoining Mr. Burch from:

> removing the remaining Life Insurance Benefit paid by Standard, or
> any portion of it, from the interest bearing Standard Secure Access
> Account which Standard established so that Defendant could cash
> checks on the Benefit following the death of Defendant's spouse
> Account. Defendant is further enjoined from spending or transferring
> any funds from the Benefit that once were in or are now in any bank
> account, investment account or other financial account within
> Defendant's possession or control.

At that time, there was $82,416.28 of monies traceable to Standard on deposit in his

accounts.   The Restraining Order was renewed up until the time the Court issued a

Preliminary Injunction against Mr. Burch, enjoining him from "spending or transferring any

funds from the Benefit that once were in or are now in any bank account, investment account,

or other financial account within his possession or control." *See* Dec. 22, 2006 Minute Entry

Order.

30.     On October 31, 2006 (time unknown), Mr. Burch cashed a check for $5,000.91 (# 1011)

from the Standard account.

31.     Mr. Burch continued to deplete the Standard account after the TRO hearing.  Overall, he used

the insurance proceeds to perform house repairs, pay debts, buy electronics, eat at restaurants,

and purchase clothing.   His testimony was extremely vague as to where the money actually

went and the Court remains uncertain as to whether Mr. Burch continues to hold some of

these proceeds in an undisclosed location.   At the time of the trial on this matter, the

Standard account, from which Mr. Burch was restrained, contained $5,678.79 in funds.

## II. **LEGAL STANDARDS**

Standard argues that Mr. Burch has been unjustly enriched by receiving, holding, spending, and retaining the insurance proceeds made available through the Standard Secure Access Account. The modern law of unjust enrichment and restitution has its roots in the common law concept of quasi-contract. At common law there were cases in which the courts, in the absence of an actual contract, nevertheless imposed "a duty. . . under certain conditions upon on a party to requite another in order to avoid the former's unjust enrichment." *Bloomgarden v. Coyer*, 479 F.2d 201, 208 (1973). To achieve this result, the courts devised a "a legal obligation closely akin to a duty to make restitution," *id*. at 210, which they called a quasi-contract. From the beginning a quasi-contract has been openly acknowledged to be a "[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where in fact there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise . . . . It is . . . founded on considerations of justice and equity, and on [the] doctrine of unjust enrichment." *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Insurance Co.*, 870 A.2d 58 (D.C. 2005) (citing Black's Law Dictionary 324 (6th ed. 1990)).

Unjust enrichment occurs when a person retains a benefit (usually money) which in justice and equity belongs to another. *4934, Inc. v. District of Columbia Dep't of Employment Servs.*, 605 A.2d 50, 55 (D.C. 1992) (citations omitted). In such a case, the recipient of the benefit has a duty to make restitution to the other person "if the circumstances of its receipt or retention are such that, as between two persons, it is unjust for [the recipient] to retain it." *Id*. at 55-56. Thus the doctrine of unjust enrichment depends on whether it is fair and just for the recipient to retain the

benefit, not on whether the person or persons who bestowed the benefit had any duty to do so. *Id*. at 56. "A claim of unjust enrichment does not require fault on the part of the recipient to the benefit." *Id*. "His innocence in receiving the benefit does not mean that his retention of that benefit without payment is just." *Id*. (citing *Partipilo v. Hallman*, 510 N.E. 2d 8, 11 (Ill. 1987)). Every unjust enrichment case is factually unique, and whether there has been unjust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution. *Id.*

## III.  ANALYSIS

The parties contest the authenticity of the signature of Ms. Priscilla Davila-Burch on the 2006 Designation Form which, despite the family disharmony clearly presented, is the critical fact question on which the outcome rests. Both Mr. Burch and Mses. Davila and Leftenant presented expert witnesses who testified that it is "highly likely" that Ms. Davila-Burch did not/did sign the form. With only a copy to examine, neither expert could proffer a more definite opinion.

As indicated above, the Court finds that Ms. Priscilla Davila-Burch executed the 2006 Designation Form on March 2, 2006, as the form indicates. This conclusion is not only supported by the testimony of Forensic Document Examiner John Hargett, who has years of service to the United States as well as the local D.C. Government[5], but also the testimony of Barbara Durham, daughters Kimberly Leftenant and Ehuniz Davila, and Ms. Mary Green from DCPS, who located the

---

[5]  Mr. Hargett has been an Examiner of Questioned Documents for the Metropolitan Police Department, Washington D.C.; the U.S. Secret Service; and the U.S. Postal Inspection Service. *See* Davila Ex. 9.

original in Ms. Davila-Burch's file and made the notorious copy for Ms. Leftenant.[6]   Ms. Laura

Greer, the nurse who also witnessed the signature, was unavailable because she has moved to

Singapore; since no deposition was ever obtained from her, the Court declined to receive an affidavit

in lieu of live testimony.   Nonetheless, the weight of the evidence clearly demonstrates that Ms.

Davila-Burch signed the 2006 Designation Form while in the hospital and delivered it to DCPS upon

her release.

    Mr. Burch argues that the form is inherently suspect, with its crossed-out social

security number; entry of Ms. Priscilla Davila's name as the first beneficiary, also crossed out;

suspect signature from witness Ms. Barbara Durham, mother of Priscilla Davila-Burch; and suspect

signature from Ms. Davila-Burch herself.  Mr. Burch also argues that the absence of testimony from

Ms. Greer should weigh into the calculus.  He alludes to the possible testimony of Alicia Davis-

Waters, a human resources specialist in benefits at DCPS, who was subpoenaed to appear but did

not.   Two e-mails between Ms. Davis-Waters and Ms. Carstens at Standard are attached to

Standard's Exhibit 11; they indicate that Ms. Waters believed the 2006 Designation Form should not

have been accepted by Standard because of its errors and lack of a certification by the DCPS person

who received it.

---

  [6]   A commentary on Ms. Green's testimony is in order.  Counsel for Mses. Davila and
Leftenant, only recently on the case, served a subpoena for Ms. Green's testimony a mere 24
hours before the date on which she was to appear, which was the second day of a two-day bench
trial.   She did not appear and the Court asked counsel for DCPS, Ms. Donna Whitman-Russell—
present because other DCPS witnesses were testifying — if she could, as a courtesy, attempt to
contact Ms. Green and ask her, as a courtesy, to appear.  That is what happened and Ms. Green
appeared and testified with little notice or preparation.  Her disinterested account of finding the
original 2006 Designation Form in Ms. Davila-Burch's file, mistakenly attached to the disability
application form, was entirely candid and credible.  The Court extends great thanks to Ms.
Whitman-Russell for her assistance.

There is no reason to question Ms. Durham's testimony as she is not a beneficiary. Ms. Durham testified in a totally credible fashion, remembering some things and being uncertain about others. The testimony of Ehuniz Davila explains the various errors on the form, completed in the hospital by a dying woman and her distraught daughters. Ms. Ehuniz Davila was an exceptionally credible witness, who impressed the Court with her straightforward answers to questions, even when some of those answers were detrimental to her position. In addition, the decision whether to credit the 2006 Designation Form was Standard's, not DCPS's. Despite the various mistakes on the form, it filled the requirements set by Standard: signed by the insured and delivered to DCPS in her lifetime.

Finally, the Court must note the incredible testimony of Mr. Burch, who was evasive and had a tendency to drop his voice to hide a non-answer. His attempts to cast aspersions on Mses. Davila and Leftenant are absurd in the face of his own unbelievable stories about not receiving voice messages, letters, or any other notice that there was a problem with the insurance distribution until he had almost wiped out the Standard Secure Access account. The Court finds that Mr. Burch knew that there was a problem with the benefits distributed to him and, at each notice from Standard, took action to remove large sums from the account established by Standard and transfer them to his own accounts at Bank of America, Chevy Chase Bank, and Wachovia. After years of marriage to an ailing Priscilla Davila-Burch, Mr. Burch quite clearly thought he deserved the proceeds of her insurance and he worked quickly to attempt to put those proceeds beyond the reach of Standard or Ms. Davila-Burch's daughters. He spent those monies on granite countertops for his renovated kitchen, paying off credit card debts, eating lavishly at restaurants, and other unspecified frivolities.

## IV.  CONCLUSION

From the above, the Court easily concludes that the 2006 Designation Form is valid; that Ms. Ehuniz Davila and Mrs. Kimberly (Davila) Leftenant were the intended beneficiaries of Priscilla Davila-Burch; and that the insurance benefits should have been split with 50% to each daughter and none to Mr. Burch.  The Court also easily concludes that Mr. Burch has been unjustly enriched by his receipt and squandering of $172,033.99 from Standard and that he should be ordered to repay all of it, since he did not begin his spending spree until after Ms. Carstens's phone call on October 5, 2006, alerting him that there was an issue with the distribution.

A memorializing order accompanies this Memorandum Opinion.

Date: March 3, 2008                                         _____/s/_____
                                                                                 ROSEMARY M. COLLYER
                                                                                 United States District Judge